IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

STEPHANIE GIACOMINI,

                           Plaintiff,                       OPINION & ORDER

    v.

                                                  14-cv-533-wmc

STANDARD INSURANCE COMPANY,

                         Defendant.

---

Pursuant to 29 U.S.C. § 1132(a)(1)(B), plaintiff Stephanie Giacomini seeks to recover accidental death and dismemberment ("AD&D") benefits she contends are due her under an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). The plan consists of a group life and accidental death and dismemberment policy issued and underwritten by defendant Standard Insurance Company. Pending before the court is defendant's motion for summary judgment. (Dkt. #15.) Under the applicable arbitrary and capricious standard, the court now finds defendant is entitled to judgment as a matter of law for reasons explained below.[1]

---

[1] This court has jurisdiction over this case pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

UNDISPUTED FACTS[2]

## I. Background

The employee welfare benefit plan at issue is sponsored by Cargill, Inc., who employed plaintiff's husband, Karl Giacomini.  In turn, that plan was insured under a group life insurance policy, Policy No. 647267-A ("the Policy"), which was issued by defendant Standard Insurance Company ("Standard").  The Policy contains an express "Allocation of Authority" provision granting discretionary authority to Standard in interpreting the Policy and administering claims.

In terms of benefits for plan members, the Policy provides basic life insurance coverage, additional life insurance coverage and AD&D coverage.  With respect to the last, the Policy provides: "If you or your Spouse have an accident, including accidental exposure to adverse conditions, while insured for AD&D Insurance, and the accident results in a Loss, we will pay benefits according to the terms of the Group Policy after we receive Proof of Loss satisfactory to us."  "Loss" is defined as "loss of life . . . which meets all of the following requirements:

1.  Is caused solely and directly by an accident.

2.  Occurs independently of all other causes.

3.  With respect to Loss of life, is evidenced by a certified copy of the death certificate."

---

[2] While plaintiff interposes numerous hearsay objections to Standard's proposed findings of fact, "[t]he [c]ourt is not bound by the Federal Rules of Evidence when reviewing an ERISA administrator's benefits determination." *Rice v. ADP TotalSource, Inc.*, 936 F. Supp. 2d 951, 961 (N.D. Ill. 2013) (citing *Black v. Long Term Disability Ins.*, 582 F.3d 738, 746 n.3 (7th Cir. 2009)). Accordingly, the court "review[s] the entire administrative record, including hearsay evidence relied upon by the administrator." *Black*, 582 F.3d at 746 n.3.

(Administrative Record (dkt. #18-1) 138 [hereinafter "AR"].)

The Policy also provides, however, that "[n]o AD&D Insurance benefit is payable if the accident or Loss is caused or contributed to by any of the following . . . 4. The voluntary use or consumption of any poison, chemical compound, or drug, unless used or consumed according to the directions of a Physician, or legal intoxication while operating a motor vehicle." (*Id.* at 139.)

## II. Plaintiff's Claim for Benefits

On July 22, 2013, Standard received a Life Insurance Benefits Proof of Death Claim Form stating that Karl Giacomini died two days earlier, and that his beneficiary was his spouse, Stephanie. The form claimed $146,000 in basic life insurance benefits; $365,000 in additional life insurance benefits; and $500,000 in AD&D insurance benefits. In describing how Karl Giacomini's injury occurred, his certified death certificate stated: "Unhelmeted driver of ATV that was thrown to ground after losing control of ATV." The certificate also listed "Subdural Hemorrhage" and "Subarachnoid Hemorrhage" as the "IMMEDIATE CAUSE" of death, and "BAC .187" under the heading of "OTHER SIGNIFICANT CONDITIONS contributing to death but not resulting in the underlying cause given in Part I." (AR (dkt. #18-3) 389.)

By letter dated August 7, 2013, Standard paid Stephanie Giacomini $511,000 in basic and additional life insurance benefits, while noting that the claim for AD&D benefits was under review. (*Id.* at 388.)

### III.  Standard's Investigation

Standard considered numerous, additional records in connection with its review of the AD&D benefits claim.  Among the records is an Officer Incident Report prepared by the Wisconsin Department of Natural Resources Bureau of Law Enforcement, which states that on Saturday, July 20, at 1:05 a.m., a one-vehicle crash occurred involving an ATV on a public road in Ellington, Wisconsin.  (AR (dkt. #18-3) 350-53.)  That report classifies the type of incident as a fall "from moving snowmobile/ATV/UTV."  (*Id.*)  It also states that the weather was "Clear," the visibility was "Good," the temperature was sixty-six degrees Fahrenheit and the road condition was "Dry."  (*Id.*)

The same Officer Incident Report states as follows:

> Sometime between [9:30 and 10 p.m.] and the accident, the victim drove his ATV further north down Greenwood Road to meet individuals in the neighborhood at a party. Witnesses said the victim had been drinking alcoholic beverages while at the party.  Just prior to 1:00 am, the victim left the party and began driving home on the paved portion of Greenwood Road.  A resident at N3423 Greenwood Road heard screeching and what sounded like a vehicle crashing at approximately 1:05 am.  The individual came outside and found the victim lying on the east edge of the pavement and observed the ATV lying on [its] side in the east ditch.  This individual called 911.
>
> . . . Based on the marks on the pavement, total distance of travel, and damage to the ATV, speed is believed to be a factor.  It was observed that there were five unopened cans of the alcoholic beverage Lime-A-Rita lying scattered around the ATV as well as the cardboard 12 pack container they had been contained in.  Based on this observation and witness statements, alcohol is also believed to have been a factor.

4

(*Id.*)   Consistent with that narrative, the report classifies Karl Giacomini's operator condition as "Had Been Drinking" and records his blood alcohol content ("BAC") as .18. (*Id.* at 351.)

The record also contains a Case Activity Report prepared by the Wisconsin Department of Natural Resources Bureau of Law Enforcement, which states that:  Karl Giacomini was found unconscious; the ATV was not carrying passengers; and deputies from the Outagamie County Sheriff's Department interviewed individuals who had observed Karl Giacomini drinking alcohol and operating the ATV before the accident occurred.  (*Id.* at 354.)  The report further stated:

> Information was obtained through interviews, by the Outagamie Sheriff's Department, that Giacomini was at a neighborhood party just north of the accident on Greenwood Road.  Witnesses said that Giacomini was drinking alcoholic beverages while at the party.  Giacomini left the neighborhood party at approximately 1:00 AM to go back to his home located at N3405 Greenwood Road.  Giacomini drove his ATV southbound on Greenwood Road on the paved surface.  At approximately 1:00 AM, a resident at **Redacted**, later identified as Ricky A. Much, heard an ATV go by his house, heard a strange noise, and did not hear the ATV again. Much went outside and saw the ATV tipped over in the ditch and Giacomini lying on the eastside of Greenwood Road. . . .

(*Id.* at 355.)   Like the Officer Incident Report, the Case Activity Report notes that Bureau wardens observed "a twelve pack cardboard case of Bud Light Lime-A-Rita beer with five unopened cans" at the scene.  (*Id.*)   Medical records indicate no one saw the accident itself.

A supplemental report prepared by Sergeant Jacob Pasch, an officer of the Outagamie County Sheriff's Department, discusses an interview with the host of the

party, Michael W. Greil.  (*Id.* at 370.)  According to Greil, Karl Giacomini had driven his ATV to the party, at which everyone was "consuming alcohol."  (*Id.*)  An additional supplement prepared by Sergeant Travis Linskens states that Ricky Much, who had also attended the party, confirmed that Karl Giacomini "had been drinking."  (*Id.* at 369.) Sgt. Linskens also "observed yaw marks that appeared to be from the ATV" and the five unopened cans of Lime-A-Rita at the scene.  (*Id.* at 368.)  A final supplement by Deputy James Schaut corroborates the presence of the five full beer cans at the scene.  (*Id.* at 367.)

Records from Theda Clark Medical Center indicate that a helicopter transported Karl Giacomini to the center and that he arrived at 1:57 a.m. on July 20, 2013.  (*Id.* at 336-37.)  Those records also indicate that Karl Giacomini's blood was drawn at 2:10 a.m. and that lab results revealed a BAC of 187 mg/dl.  (*Id.* (dkt. #18-2) 268.)  Doctor Steven Weinshel later ordered a nuclear medicine brain flow scan, which showed no evidence of intercranial blood flow.  (*Id.* at 304.)  At 11:00 a.m. that same morning, Dr. Weinshel declared Karl Giacomini brain dead.  (*Id.*)

A Modified Hospital Admission Coroner's Report prepared by the Outagamie County Office of the Coroner states that Giacomini had a "[s]ubdural hematoma isolated head" injury.  The Coroner described the "Terminal Event" as follows: "Patient fell from a moving ATV.  He was not wearing a helmet.  Sustained isolated head trauma.  He had a glas[g]ow coma scor[e] of 3 on scene.  The patient fell due to speed and alcohol."  (*Id.*at 161.)

Beyond this record review, Standard also consulted with Steven C. Beeson, M.D., who was Board Certified in Internal Medicine.  In his Physician Consultant Memo, dated October 2, 2013, Dr. Beeson responded to one of Standard's questions as follows:

> 1. *How would a blood alcohol content of 0.187 affect a person's ability to operate a motor vehicle?*
>
> Patients with that level of alcohol intoxication have significant gross motor impairment, lack of physical control, blurred vision, and major loss of balance.  Judgment and perception are severely impaired.  At a level of 0.20 a patient may be dazed and confused and disoriented and may need help to stand or walk.  Pain response is blunted.  Nausea and vomiting are common.  Gag reflex is impaired.  Blackouts are likely.

(*Id.* at 257.)

## IV.  Initial Decision and Review on Appeal

In a letter dated October 29, 2013, Standard informed Stephanie Giacomini of its determination that no AD&D benefits were due her, "[b]ecause Mr. Giacomini was legally intoxicated while operating a motor vehicle."  (*Id.* at 244.)  On December 3, 2013, Stephanie Giacomini's counsel submitted an appeal from this claim denial.  Among other arguments, Giacomini's counsel claimed that "motor vehicle" was an undefined term and could "certainly be viewed as not extending to an all-terrain vehicle," particularly in light of Wisconsin statutes that exclude ATVs from the definition of "motor vehicle."  (*Id.* at 240.)  Furthermore, the letter stated:

> We would note that the initial investigation suggested that Mr. Giacomini lost his hat prior to losing control of the vehicle.  It is certainly reasonable to believe that as the hat flew off he reflexively reached to try to capture it, lost control of the vehicle and crashed.  That is a far more plausible explanation than the notion that he braked and swerved

> suddenly to turn into a driveway that he had entered literally
> hundreds of times before.

(*Id.* at 241.)

In a follow-up letter dated January 9, 2014, Giacomini's counsel further noted that "the model of ATV involved in this accident, the 2010 Polaris Sportsman XP 850, has been the subject of a CPSC recall" because "the front suspension ball joint stem can separate from the steering knuckle and cause the rider to lose steering control, posing a risk of injury or death to riders." (*Id.* at 233.) He characterized this information as "an alternative explanation for the accident which is completely unrelated to intoxication." (*Id.*)

In response, Standard consulted a second physician, Brent Morgan, M.D., who was Board Certified in Medical Toxicology and Emergency Medicine and worked as an Associate Professor of Emergency Medicine at Emory University's School of Medicine and the Director of Grady Memorial Hospital's Occupational and Environmental Toxicology Clinic. Dr. Morgan performed a Physician Peer Review dated January 26, 2014. (*Id.* at 216.) In response to Standard's request that Dr. Morgan comment on how a BAC of 187 mg/dL would typically affect a person, Dr. Morgan stated:

> Alcohol at a concentration of 187 mg/dL has clearly been
> shown to decrease one's ability to operate a motor vehicle
> safely. Alcohol impairs consciousness, depth perception,
> peripheral vision, reasoning, judgment, and concentration. In
> addition, alcohol slows reflexes, slows reaction time, and
> impairs gross motor control.

(*Id.*)

Standard also asked Dr. Morgan to opine as to whether the information in the claim file supported "more reasonably than not that Mr. Giacomini's ATV accident and/or subsequent death were caused or contributed to by his legal intoxication while operating a motor vehicle." (*Id.* at 217.)  Dr. Morgan responded in part:

> [A]lcohol impairment of driving abilities begins to occur at 50 mg/dl or less.  Any fatality occurring in a crash involving a driver with a BAC of 80 mg/dl or higher is considered to be an alcohol-impaired-driving fatality. . . . At a BAC of 80 mg/dl, drivers are so impaired that they are 11 times more likely to have a single-vehicle crash than drivers with no alcohol in their system.  According to the Insurance Institute for Highway Safety (IIHS) the relative risk of death for drivers in single vehicle crashes with an elevated blood alcohol is greater than 300 times that of sober drivers. . . . [I]t is my opinion that more likely than not alcohol impairment contributed to and/or directly caused Mr. Giacomini's ATV accident and subsequent death.

(*Id.*)

Standard also obtained a copy of the U.S. Consumer Product Safety Commission's recall, which applies to 2010 Sportsman XP 850 ATVs "with certain VIN numbers" and advises consumers to "contact their local Polaris dealer to determine if your model and VIN number are included in this recall."  Standard then wrote to Stephanie Giacomini's counsel requesting:  (1) verification that the recall applied to Karl Giacomini's ATV; and (2) documentation of any front suspension damage to or malfunction in the ATV.  (*Id.* at 195.)  In response, via a letter dated March 10, 2014, counsel provided the serial number, while noting that "we do not believe the recall is the controlling fact in the case, although it is significant."  (*Id.* at 191.)

## V.  Final Decision

On April 10, 2014, Standard's Administrative Review Unit ("ARU") notified Stephanie Giacomini's counsel that it had upheld the original determination that no AD&D benefits were payable.  (*Id.* at 166-74.)  In particular, the ARU concluded that an ATV qualified as a "motor vehicle" because Karl Giacomini had operated it on a highway or roadway.  The ARU also noted in the letter that no documentation supported the alternate theory that Karl Giacomini had caused the accident by reflexively reaching for his hat.  Furthermore, the letter concluded, Karl Giacomini's intoxication had contributed to his accident and death even if he had reached for his hat.  The letter pointed out that Stephanie Giacomini had neither submitted documentation showing that the ATV was subject to the identified recall, nor had issues with the front-end suspension.  Finally, the ARU claim file presented no evidence of a recall-related malfunction that might have caused or contributed to the accident.

OPINION

## I.  Standard of Review

When an ERISA challenge concerns a Policy that grants discretion to the administrator or fiduciary to determine eligibility for benefits and construe plan terms, courts ordinarily review a denial of benefits only to determine "whether the administrator's decision was 'arbitrary and capricious.'"  *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010) (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008); *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 860-61 (7th Cir. 2009)).  Not surprisingly, Standard's motion for summary judgment invokes

this favorable analysis, reviewing in detail the evidence in the record that supports its determination that Stephanie Giacomini is not entitled to any AD&D benefits under the Policy.

In response, plaintiff does not argue that Standard's decision *was* arbitrary and capricious.  Rather, she contends that Minnesota law renders the grant of discretion in the Policy unenforceable, entitling her to a *de novo* review of her claims under *Firestone Tire and Rubber Company v. Bruch*, 489 U.S. 101, 115 (1989).  Beyond the straightforward difference between a *de novo* and abuse of discretion standard of review, the applicable standard may also affect what evidence the court considers in reviewing plaintiff's claim for benefits.

Under the deferential abuse of discretion standard, the court is limited to the evidence in the administrative record.  *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 462 (7th Cir. 2001).  Under a *de novo* standard of review, in contrast, this court would have "the discretion to 'limit the evidence to the record before the plan administrator, or . . . [to] permit the introduction of additional evidence necessary to enable it to make an informed and independent judgment.'"  *Estate of Blanco v. Prudential Ins. Co. of Am.*, 606 F.3d 399, 402 (7th Cir. 2010) (quoting *Patton v. MFS/Sun Life Fin. Distribs., Inc.*, 480 F.3d 478, 490 (7th Cir. 2007)); *see also Patton*, 480 F.3d at 490 n.7. Accordingly, before reviewing Standard's decision, the court first must determine the appropriate standard of review.

Minnesota Statute § 62Q.107 contains a prohibition on discretionary clauses in certain health insurance policies and states:

11

> Beginning January 1, 1999, no health plan, including the coverages described in section 62A.011, subdivision 3, clauses (7) and (10),[3] may specify a standard of review upon which a court may review denial of a claim or of any other decision made by a health plan company with respect to an enrollee. This section prohibits limiting court review to a determination of whether the health plan company's decision is arbitrary and capricious, an abuse of discretion, or any other standard less favorable to the enrollee than a preponderance of the evidence.

While ERISA generally supersedes "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan[,]" 29 U.S.C. § 1144(a), plaintiff contends that ERISA's savings clause, 29 U.S.C. § 1144(b)(2)(A), applies to Section 62Q.107 because it is a law "which regulates insurance." Legal authority for that proposition is sparse. Plaintiff points out that various courts have concluded other states' prohibitions on discretionary clauses fall within ERISA's savings clause. *See, e.g.*, *Standard Ins. Co. v. Morrison*, 584 F.3d 837, 849 (9th Cir. 2009) ("[W]e agree with the district court that the Commissioner's practice of disapproving discretionary clauses is not preempted by ERISA's exclusive remedial scheme."); *Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 609 (6th Cir. 2009) (Michigan rules prohibiting discretionary clauses in insurance contracts are not preempted); *Curtis v. Hartford Life & Accident Ins. Co.*, No. 11 C 2448, 2012 WL 138608, at *10 (N.D. Ill. Jan. 18, 2012) (Illinois regulation prohibiting discretionary clauses not preempted). *But see Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1151-52 (10th Cir. 2009) (rule banning discretionary clauses in

---

[3] The coverages described in clauses (7) and (10) are "blanket accident and sickness insurance as defined in section 62A.11" and coverage "issued as a supplement to Medicare." The AD&D coverage does not qualify as either of these types of coverage.

insurance forms enforceable provided they comply with certain language and formatting requirements found to be preempted by ERISA).

Assuming that the ERISA savings clause might be properly invoked by plaintiff here, the court must still determine whether Minnesota Statute § 62Q.107 applies to the facts before this court.  As noted above, the statute by its terms prohibits discretionary clauses in "health plans."  "Health plan" is "defined in section 62A.011 or a policy, contract, or certificate issued by a community integrated service network."  Minn. Stat. § 62Q.01, subd. 3.  Section 62A.011, in turn, provides an extensive definition of "health plan."  As it turns out, therefore, whether the AD&D coverage is a "health plan" within the meaning of that statute determines its applicability.

In her brief in opposition to summary judgment, plaintiff points out that "health plan" is defined in part as "a policy or certificate of accident and sickness insurance as defined in section 62A.01 offered by an insurance company licensed under chapter 60A[.]"  Minn. Stat. § 62Q.01, subd. 3.  Section 62A.01 also provides that a "policy of accident and sickness insurance" "includes any policy covering the kind of insurance described in section 60A.06, subdivision 1, clause (5)(a)."  Minn. Stat. § 62A.01, subd. 1.  Clause (5)(a) further reads that:

> To insure against loss or damage by the sickness, bodily injury or death by accident of the assured or dependents, or those for whom the assured has assumed a portion of the liability for the loss or damage, including liability for payment of medical care costs or for provision of medical care.

Minn. Stat. § 60A.06, subd. 1, cl. (5)(a).

In light of this definition, plaintiff argues that the AD&D coverage constitutes a "policy or certificate of accident and sickness insurance," emphasizing the fact that it insures against "death by accident."  The court disagrees.  While clause (5)(a) certainly does insure against loss due to the insured's "sickness, bodily injury or death by accident," it *also* requires that the coverage include "liability for payment of medical care costs or for provision of medical care."   Minn. Stat. § 60A.06, subd. 1, cl. (5)(a). Plaintiff points to nothing in the Policy that suggests it provides for payment of medical care costs.

Even if the Policy here met the definition in clause (5)(a), Standard cites to the list of specific *exclusions* in the definition of a "health plan" found in Section 62A.011. According to Standard, the AD&D coverage in the Policy falls within three of those exclusions:

> Health plan does not include coverage that is:
>
> (1) limited to disability or income protection coverage; . . .
>
> (4) designed solely to provide payments on a per diem, fixed indemnity, or non-expense-incurred basis, including coverage only for a specified disease or illness or hospital indemnity or other fixed indemnity insurance, if the benefits are provided under a separate policy, certificate, or contract for insurance; there is no coordination between the provision of benefits and any exclusion of benefits under any group health plan maintained by the same plan sponsor; and the benefits are paid with respect to an event without regard to whether benefits are provided with respect to such an event under any group health plan maintained by the same plan sponsor; . . . [or]
>
> (8) accident-only coverage[.]

Minn. Stat. § 62A.011, subd. 3.

If any of these three exclusions applies, the Policy does not constitute a "health plan" and is not subject to § 62Q.107's prohibition on discretionary clauses.  *Cf. Dehart v. Life Ins. Co. of N. Am.*, No. 2:11-cv-11806, 2013 WL 4777184, at *4 (E.D. Mich. Sept. 5, 2013) (declining to invalidate discretionary clause under Section 62Q.107 where ERISA plan provided only long-term-disability benefits); *Sullivan v. Unum Life Ins. Co. of Am.*, No. 10-4076, 2011 WL 3837134, at *6-7 (D. Minn. Aug. 26, 2011) (declining to invalidate discretionary clause under Section 62Q.107 where ERISA plan "primarily provide[d] income protection"), *rev'd on other grounds sub nom Govrik v. Unum Life Ins. Co. of Am.*, 702 F.3d 1103 (8th Cir. 2013).

Here, too, the court agrees with Standard that the Policy fits at least one of these exclusions.  Without expressing an opinion as to whether the Policy is "limited to disability or income protection coverage" or "accident-only coverage," the court agrees that it is designed to provide payments on a fixed indemnity/non-expense-incurred basis under Section 62A.011.[4]  The Policy itself indicates that the AD&D benefit payable is equal to the member's Plan 1 (basic) Life Insurance Benefit.  (AR 67.)  Since neither the AD&D benefit nor the life insurance coverage makes reference to expenses incurred, and the Policy as a whole lacks any coordination with, or reference to, a group health plan,

---

[4] There appears to be uncertainty as to whether the court must assess the Policy as a whole in determining whether it fits within the definition of "health plan" or just the AD&D coverage provision actually at issue in this suit.  *Compare Dehart*, 2013 WL 4777184, at *4 (noting that "the *policy* at issue concerns only LTD benefits and is not a 'health plan' under Minnesota law"), *with* Minn. Stat. § 62A.011, subd. 3 (stating that the term "health plan" "does not include *coverage*" that fits within one of the listed categories) (emphasis added).  If the court need only assess the AD&D coverage portion of the Policy to determine whether it is a health plan, then it would on its face be excluded as "accident-only coverage."  (*See* AR 138 (benefits payable only if loss is "caused solely and directly by an accident").)  Because the Policy as a *whole* is not so limited, however, the court assesses the entire Policy in determining whether it constitutes a "health plan," without deciding whether this broader review is actually required.

15

the Policy is not a "health plan" within the meaning of Section 62Q.107 and the accompanying prohibition on discretionary clauses does not apply. Accordingly, this court must review Standard's decision under the arbitrary and capricious standard adopted by the plan. *See Dehart*, 2013 WL 4777184, at *4-8 (rejecting application of Section 62Q.107 and concluding that decision was not arbitrary and capricious).[5]

## II.    Merits Review

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of [an ERISA fiduciary]." *Reilly v. Blue Cross & Blue Shield United of Wis.*, 846 F.2d 416, 420 (7th Cir. 1988) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (alterations in original)). While this court owes the administrator significant deference, the Seventh Circuit has nevertheless cautioned that "[r]eview under this standard is not a rubber stamp," *Holmstrom*, 615 F.3d at 766, and "deference need not be abject," *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir. 1996). Instead, the court is to uphold an administrator's decision "if (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass important aspects of the problem." *Militello v. Cent. States, Se. & Sw. Areas Pension Fund*, 360 F.3d 681, 686 (7th

---

[5] Because the court concludes that Section 62Q.107 does not apply here, it need not consider whether that statute would be preempted by ERISA or whether it is appropriate to apply Minnesota law.

16

Cir. 2004) (internal quotation marks and citations omitted).  Likewise, the court is to uphold an administrator's interpretation of an ERISA plan so long as it is reasonable. *Conkright v. Frommert,* 559 U.S. 506, 521 (2010).

Under this deferential standard, Standard's decision to deny AD&D benefits cannot be characterized as arbitrary and capricious.  With respect to its interpretation of the Policy, AD&D benefits are not payable when "legal intoxication while operating a motor vehicle" either causes or contributes to the accident or loss.  Given that Karl Giacomini's blood alcohol concentration was more than twice Wisconsin's legal limit of 0.08, he was undoubtedly legally intoxicated while operating his ATV.  *See* Wis. Stat. § 23.33(4c)(a)(2) ("No person may engage in the operation of an all-terrain vehicle or utility terrain vehicle while the person has an alcohol concentration of 0.08 or more."). Similarly, ATVs are vehicles propelled by tires on a motor, and Karl Giacomini was driving his on a public roadway.  Nothing about Standard's interpretation of the term "motor vehicle" to include an ATV, at least under those circumstances, is unreasonable.

There is likewise ample evidence to support Standard's conclusion that Karl Giacomini's intoxication while operating the ATV caused or contributed to his death. Standard had before it various reports from officials who responded to the accident scene, including interviews with witnesses who confirmed that Karl Giacomini had been drinking.  It had blood test results demonstrating that his BAC was .187 soon after the accident, significantly over the legal limit.  It had the memorandum from Dr. Beeson indicating that someone with Karl Giacomini's BAC would "have significant gross motor impairment, lack of physical control, blurred vision, and major loss of balance" as well as

17

"severely impaired" judgment and perception.  Furthermore, when plaintiff appealed the denial of coverage, Standard obtained an additional medical opinion, which supported its initial conclusion that Karl Giacomini's legal intoxication while operating the ATV caused or contributed to his death.  It also investigated the alternative cause that plaintiff's counsel proposed -- the ATV recall -- and obtained no evidence that mechanical failure played any part in the accident.  Overall, it is undoubtedly "possible to offer a reasoned explanation, based on the evidence, for" Standard's determination. *Militello*, 360 F.3d at 686.

Notably, plaintiff does not actually brief the question of whether Standard's decision was arbitrary and capricious; her opposition is limited to her contention that this court must review Standard's decision *de novo*, which the court rejected above.  As such, she has essentially waived any opposition on those grounds.  *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").  She does purport to dispute some of defendant's proposed findings of fact on the grounds that there is insufficient evidence to establish the truth of those facts -- for example, she admits that Dr. Beeson opined that a patient with a BAC of .187 would have "significant gross motor impairment, lack of physical control, blurred vision, and major loss of balance," but argues that there is no evidence that Karl Giacomini *actually* suffered from those symptoms when the accident occurred.  (Pl.'s Resp. DPFOF (dkt. #25) ¶ 29.)  To the extent this is intended to serve as an argument that Standard's decision was arbitrary and capricious, the court disagrees.  This court must only determine whether Standard's decision has rational support in the record, *Becker v.*

*Chrysler LLC Health Care Benefits Plan*, 691 F.3d 879, 885 (7th Cir. 2012), not whether the decision was *right*, *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1147 (7th Cir. 1998). The reports from the law enforcement officials who responded to the scene of the accident, coupled with the opinions of the two physician consultants, undoubtedly provide "rational support" for Standard's determination at the very least.

Finally, the court notes that, even faced with a motion for summary judgment, plaintiff cited *no* evidence tending to undermine the evidence on which Standard relied, nor did she point to any evidence in the administrative record that supports an alternate theory of causation. *See Armato v.* Grounds, 766 F.3d 713, 719 (7th Cir. 2014) ("Inferences that rely upon speculation or conjecture are insufficient" to avoid summary judgment). The court is not required to search the record for such evidence or piece together arguments on plaintiff's behalf. *Diadenko v. Folino*, 741 F.3d 751, 757 (7th Cir. 2013).

Plaintiff has undoubtedly suffered a tragedy, and the court is sympathetic to her loss. However, given the record before this court -- including law enforcement reports and opinions from multiple physician consultants -- the court is unable to find Standard acted arbitrarily or capriciously in finding that Karl Giacomini's legal intoxication while operating a motor vehicle caused or contributed to his accident, which excepts the accident from the sphere of covered "loss" under the terms of the Policy's AD&D provision. Accordingly, plaintiff has failed to show that a genuine dispute of fact remains for trial, and Standard is entitled to summary judgment in its favor.

ORDER

IT IS ORDERED that:

1) Defendant Standard Insurance Company's motion for summary judgment (dkt. #15) is GRANTED.

2) The clerk of court is directed to enter judgment and close this case.

Entered this 15th day of September, 2015.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

20